THE STATE OF OHIO, APPELLEE, *v.* LUCAS, APPELLANT.

[Cite as *State v. Lucas,* 100 Ohio St.3d 1, 2003-Ohio-4778.]

(No. 2002–0925—Submitted March 12, 2003—Decided September 24, 2003.)

PFEIFER, J.

### Factual and Procedural Background

{¶ 1} On May 23, 2001, defendant-appellant, Betty S. Lucas, was charged with one count of domestic violence and one count of complicity to violate a protection order. She had been granted a protection order against Joseph Lucas, her ex-husband, on October 4, 2000. The charges against appellant arose from an incident at her home on May 10, 2001. On that day, appellant had invited her ex-husband into her home for the birthday celebration of one of their children. Appellant and Joseph Lucas consumed alcohol together there, and later had an argument that led to a physical altercation. Joseph Lucas sustained a fractured and dislocated elbow and head injuries and was treated at a hospital. Appellant suffered a bruised nose. Police charged Joseph Lucas with a violation of the protection order. Appellant was charged with complicity to violate a protection order, as well as with domestic violence.

{¶ 2} On June 12, 2001, appellant filed a motion to dismiss the complicity charge. The trial court denied the motion. On August 8, 2001, appellant entered a plea of no contest to the complicity charge and a plea of guilty to the domestic violence charge. The trial court found her guilty of both offenses and sentenced her to 90 days in jail on each charge, but suspended the time and placed her on probation for two years.

{¶ 3} Appellant appealed from the conviction on the complicity charge. Appellant argued that a person sheltered by a protection order is the victim of any violation of that order and that as a victim, she is a member of a protected class. Therefore, she maintained, prosecuting the victim runs counter to the intent of the General Assembly. The court of appeals rejected appellant's arguments and affirmed the trial court. The appellate court eschewed public-policy analysis and found that appellant's behavior went beyond what R.C. 2923.03(A)(2), the complicity statute, requires to show that someone aided or abetted another in the commission of a crime.

{¶ 4} The court of appeals' decision was directly at odds with the conclusion reached by the Eighth District Court of Appeals in *N. Olmsted v. Bullington* (2000), 139 Ohio App.3d 565, 744 N.E.2d 1225. The *Bullington* court held that a person granted a protection order "is a member of the protected class designated for protection from violent abusers" and that "[c]onsequently, the victim may not be charged as an aider and abetter of the violation of a [protection order] by an offender." Id. at 571, 744 N.E.2d 1225.

{¶ 5} Upon the appellant's motion, the court of appeals certified a conflict between its holding and the holding of the court in *Bullington*. Recognizing a conflict between appellate districts, this court granted jurisdiction and requested briefing on the following issue:

{¶ 6} "Whether an individual, who is the protected subject of a temporary protection order, may be prosecuted for aiding and abetting the offender, who is the restrainee under the protection order, in violating said order."

Law and Analysis

{¶ 7} R.C. 2919.27(A)(1) states, "No person shall recklessly violate the terms of * * * [a] protection order issued or consent agreement approved pursuant to section 2919.26 or 3113.31 of the Revised Code." The protection order against Joseph Lucas was issued by the court pursuant to R.C. 3113.31.

{¶ 8} The inclusion of the mental state of "recklessly" in R.C. 2919.27(A)(1) ensures that if there is a chance meeting between the subjects of a protection order, the result is not a crime. There is a crime, however, if, in visiting a certain place, the restrainee "perversely disregards a known risk." R.C. 2901.22(C).

{¶ 9} R.C. 2923.03, Ohio's complicity statute, states:

{¶ 10} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

{¶ 11} "* * *

{¶ 12} "(2) Aid or abet another in committing the offense."

{¶ 13} The issue before us is whether a protected subject of a protection order can be complicit in the violation of a protection order.

{¶ 14} The United States Supreme Court was faced with an analogous question in construing the Mann Act in *Gebardi v. United States* (1932), 287 U.S. 112, 53 S.Ct. 35, 77 L.Ed. 206. Under the Mann Act, it was a felony for any person to "transport or cause to be transported, or aid or assist in obtaining transportation for, or in transporting, in interstate or foreign commerce, * * * any woman or girl for the purpose of prostitution or debauchery * * *." Id. at 118, 53 S.Ct. 35, 77 L.Ed. 206, quoting Section 398, Title 18, U.S.Code. In *Gebardi*, the court addressed the issue of whether a female willingly transported across state lines could be convicted of conspiracy to violate the Mann Act.

{¶ 15} The court recognized that "the statute is drawn to include those cases in which the woman consents to her own transportation" and first looked at whether the Mann Act itself punished acquiescing women. Id. at 119, 53 S.Ct. 35, 77 L.Ed. 206. The court found that punishment of transported women was not a focus of the statute:

{¶ 16} "[I]t does not specifically impose any penalty upon her, although it deals in detail with the person by whom she is transported. In applying this criminal statute we cannot infer that the mere acquiescence of the woman transported was intended to be condemned by the general language punishing those who aid and assist the transporter * * *. * * * The penalties of the statute are too clearly directed against the acts of the transporter as distinguished from the consent of the subject of the transportation." Id.

{¶ 17} Satisfied that the Mann Act did not in fact call for criminal penalties for transported women, the court moved to the following inquiry:

{¶ 18} "[W]e must decide whether her concurrence, which was not criminal before the Mann Act, nor punished by it, may, without more, support a conviction under the conspiracy section, enacted many years before." Id. at 120, 53 S.Ct. 35, 77 L.Ed. 206.

{¶ 19} The *Gebardi* court reasoned that, had Congress intended to punish the behavior of the women transported in violation of the Mann Act, it would have done so within the Act. The court found that Congress had "set out * * * to deal with cases which frequently, if not normally, involve consent and agreement on the part of the woman to the forbidden transportation." Id. at 121, 53 S.Ct. 35, 77 L.Ed. 206. Despite this cognizance by Congress, the acquiescence of women was not made a crime under the statute.

{¶ 20} The court took Congress's silence within the Mann Act on the criminality of a woman's acquiescence as "evidence of an affirmative legislative policy to

leave her acquiescence unpunished." Id. at 123, 53 S.Ct. 35, 77 L.Ed. 206. The court continued:

{¶ 21} "We think it a necessary implication of that policy that when the Mann Act and the conspiracy statute came to be construed together, as they necessarily would be, the same participation which the former contemplates as an inseparable incident of all cases in which the woman is a voluntary agent at all, but does not punish, was not automatically to be made punishable under the latter. It would contravene that policy to hold that the very passage of the Mann Act effected a withdrawal by the conspiracy statute of that immunity which the Mann Act itself confers." Id.

{¶ 22} The *Gebardi* decision has some roots in the English common law. In *The Queen v. Tyrell* (1893), 1 Q.B. 710, the court held that an underage female cannot aid and abet a male in having "unlawful carnal knowledge" of her. The court noted that by legislative design, females were omitted from the operation of the statute and potential criminal liability: "[I]t is impossible to say that the Act, which is absolutely silent about aiding or abetting, or soliciting or inciting, can have intended that the girls for whose protection it was passed should be punishable under it for the offences committed upon themselves." Id. at 712.

{¶ 23} In a more recent case, the court in *In re Meagan R.* (1996), 42 Cal.App.4th 17, 49 Cal.Rptr.2d 325, considered the issue of whether a victim of statutory rape can be charged with aiding and abetting that crime. The court held that "where the Legislature has dealt with crimes which necessarily involve the joint action of two or more persons, and where no punishment at all is provided for the conduct, or misconduct, of one of the participants, the party whose participation is not denounced by statute cannot be charged with criminal conduct on either a conspiracy or aiding and abetting theory." 42 Cal.App.4th at 24, 49 Cal.Rptr.2d 325. The court added that "when the Legislature has imposed criminal penalties to protect a specific class of individuals, 'it can hardly have meant that a member of that very class should be punishable either as an aider or abettor or as a co-conspirator.'" 42 Cal.App.4th at 24–25, 49 Cal.Rptr.2d 325, quoting *United States v. Annunziato* (C.A.2, 1961), 293 F.2d 373, 379.

{¶ 24} Although we are dealing with a different statute in this case and a charge of aiding and abetting rather than conspiracy, *Gebardi* is especially instructive. As was the case with the Mann Act, Ohio's protection-order statutes fail to criminalize a protected party's activities in inviting or acquiescing in a violation of the statutes.

{¶ 25} In the language of R.C. 3113.31, the General Assembly evinces its recognition that in some instances of violations of protection orders, the protected party invites the violation. R.C. 3113.31(E)(7)(a) provides:

{¶ 26} "If a protection order issued * * * under this section includes a requirement that the respondent * * * refrain from entering the residence, school, business, or place of employment of the petitioner or a family or household member, the order or agreement shall state clearly that *the order or agreement cannot be waived or nullified by an invitation to the respondent from the petitioner* or other family or household member to enter the residence, school, business, or place of employment or by the respondent's entry into one of those places otherwise upon the consent of the petitioner or other family or household member." (Emphasis added.)

{¶ 27} The General Assembly both recognizes and addresses the potential problem of a protected party's acquiescence in the violation of a protection order. The General Assembly demonstrates its cognizance of the volatile and mercurial nature of certain interpersonal relationships and insulates protection orders from the heat and chill of shifting emotions. It removes the excuse of an invitation, a perceived invitation, or a concocted invitation from affecting the power of a protection order. The General Assembly has made the issue of an invitation entirely irrelevant as to the culpability of a respondent's violation of a protection order.

{¶ 28} As noted in *Gebardi* with regard to the Mann Act, the General Assembly's silence within R.C. 3113.31 as to the fate of a petitioner who invites the violation of a protection order is meaningful. The statute contemplates that such circumstances will arise. Just as clearly, the protected party faces no criminal liability for such an invitation. The statute is devoid of any penalty for a petitioner who invites contact with a respondent.

{¶ 29} The General Assembly further demonstrates that complainants are not to be held criminally liable for violations of protection orders by statutorily restricting the issuance of mutual protection orders. Mutual protection orders require both complainants and restrainees to refrain from activities identified in a protection order. R.C. 3113.31(E)(4) prohibits mutual protection orders—"[a] court may not issue a protection order that requires a petitioner to do or to refrain from doing an act that the court may require a respondent to do or to refrain from doing under * * * this section"—unless certain factors apply. For a petitioner to be held to the terms of the protection order, the respondent must file a separate petition for a protection order. R.C. 3113.31(E)(4)(a). Then, the court must determine (1) that the petitioner has committed an act of domestic violence or violated a temporary protection order issued pursuant to section 2919.26 of the Revised Code, (2) that both parties acted primarily as aggressors, and (3) that neither party acted primarily in self-defense. R.C. 3113.31(E)(4)(d).

{¶ 30} The General Assembly has set forth a specific process, with a specific burden, by which a protection order's protected party may be subject to the

terms of a protection order. Prosecuting a protected party under a protection order for aiding and abetting the violation of her own protection order is tantamount to issuing and enforcing a mutual protection order against the victim without going through the mandated process for making the protected party subject to the requirements of the protection order.

{¶ 31} This court, in its Rules of Superintendence, also notes the difference between the treatment of a petitioner and a respondent when a protection order is violated. Pursuant to Sup.R. 10.01(D) and 10.02(C), all civil and criminal domestic violence protection orders issued by the courts of the state of Ohio contain two sets of warnings—one for the petitioner and one for the respondent—that must be substantially similar to Sup.R. Form 10.01–G. The Sup.R. Form 10.01–G warning to petitioners reads as follows:

{¶ 32} "You **cannot** change the terms of this order by your words or actions. Only the Court can allow the Respondent/Defendant to contact you or return to your residence. If you and the Respondent/Defendant want to resume your relationship, you **must** ask the Court to modify or dismiss this Protection Order." (Emphasis sic.)

{¶ 33} For the respondent, the threat of criminal charges on Sup.R. Form 10.01–G is front and center:

{¶ 34} "Only the Court can change this order. The Petitioner/Alleged Victim cannot give you legal permission to change this order. If you go near the Petitioner/Alleged Victim, even with the Petitioner's/Alleged Victim's consent, you may be arrested. If you and the Petitioner/Alleged Victim want to resume your relationship you must ask the Court to modify or dismiss this Protection Order. You act at your own risk if you disregard this WARNING." (Emphasis sic.)

{¶ 35} The sharp distinction between how the Rules of Superintendence address petitioners and respondents reflects the General Assembly's intention that only one party—the respondent—can be criminally responsible for the violation of a protection order.

{¶ 36} Thus, like the *Gebardi* court, we must construe a statute that recognizes that a protected party can participate in the violation of the very statute that affords protection but provides no punishment for the protected party's activity. Here, too, we find what the *Gebardi* court called "evidence of an affirmative legislative policy to leave [a petitioner's] acquiescence unpunished." *Gebardi*, 287 U.S. at 123, 53 S.Ct. 35, 77 L.Ed. 206. We find that R.C. 3113.31 confers immunity to petitioners from punishment for respondents' violation of protection orders. To allow that immunity to be undone by the complicity statute would contravene the very statute that grants the immunity.

{¶ 37} The practical application of Ohio's protection-order statutes demands this result. If petitioners for protection orders were liable for criminal prosecution, a violator of a protection order could create a real chill on the reporting of the violation by simply threatening to claim that an illegal visit was the result of an illegal invitation.

{¶ 38} Finally, this case is different from most. Had Betty Lucas not gotten the better of her husband, this case would probably not be here. In most instances of an invited violation of a protection order, police are not called until the violence starts. In those cases, the protected party receives the brunt of the injuries. If we were to find against appellant in this case, we would also be finding against those other protected parties. We would be, in effect, allowing abused women to be charged with complicity. That is a prospect neither intended by the General Assembly nor acceptable as a matter of public policy.

{¶ 39} The General Assembly has made an invitation by the petitioner for the respondent to violate the terms of a protection order irrelevant to a respondent's guilt. Protection orders are about the behavior of the respondent and nothing else. How or why a respondent finds himself at the petitioner's doorstep is irrelevant. To find appellant guilty of complicity would be to criminalize an irrelevancy.

{¶ 40} Accordingly, we hold that an individual who is the protected subject of a temporary protection order may not be prosecuted for aiding and abetting the restrainee under the protection order in violating said order. We therefore reverse the judgment of the court of appeals.

Judgment reversed.

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, PIETRYKOWSKI and LUNDBERG STRATTON, JJ., concur.

O'CONNOR, J., concurs in judgment only.

MARK L. PIETRYKOWSKI, J., of the Sixth Appellate District, sitting for COOK, J.

---

Elena V. Tuhy, Newark Assistant Law Director, for appellee.

Law Offices of Kristin Burkette and Andrew T. Sanderson, for appellant.

Ohio State Legal Services Association and Michael R. Smalz; Legal Aid Society of Cleveland and Alexandria M. Ruden, urging reversal for amici curiae Action Ohio Coalition for Battered Women, Ohio Domestic Violence Network, and Ohio NOW Education and Legal Fund.