[Cite as *State v. Conklin*, 2021-Ohio-417.]

IN THE COURT OF APPEALS

ELEVENTH APPELLATE DISTRICT

GEAUGA COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | **O P I N I O N** |
| Plaintiff-Appellee, | : | |
| - vs - | : | **CASE NO.  2020-G-0242** |
| MARC A. CONKLIN, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal from the Chardon Municipal Court, Case No. 2019 CRB 00556.

Judgment: Affirmed.


*Steven E. Patton*, Patton & Lee, LLC, 7160 Chagrin Road, Suite 155, Chagrin Falls, Ohio 44023 (For Plaintiff-Appellee).

*Robert R. Wantz*, 107 Water Street, Chardon, Ohio 44024; and *Cory R. Hinton*, Hanahan & Hinton, LLC, 8570 Mentor Avenue, Mentor, Ohio 44060 (For Defendant-Appellant).


MARY JANE TRAPP, P.J.

{¶1}    Appellant, Marc A. Conklin ("Mr. Conklin"), appeals from the judgment entry of the Chardon Municipal Court, which found him guilty of two counts of violating a civil stalking protection order ("CSPO") and one count of domestic violence, following a violent altercation with his girlfriend, Marisa Sobeski ("Ms. Sobeski"), who was also the protected party of the CSPO.

{¶2}    Mr. Conklin raises three assignments of error on appeal, arguing his convictions are against the manifest weight of the evidence because (1) he and Ms.

Sobeski were not family or household members as required by R.C. 2919.25, the domestic violence statute; (2) he could not have "recklessly" violated the CSPO since he was "under the impression" that it had been dismissed; and (3) Ms. Sobeski's version of events was simply not credible since there was evidence that she was intoxicated at the time of the incident and that he had acted in self-defense.

{¶3} After a careful review of the record and pertinent case law, we find the manifest weight of the evidence supports Mr. Conklin's convictions because (1) there was evidence by way of the testimony of both Ms. Sobeski and Mr. Conklin that they had cohabited with one another within the past five years; (2) a protected party under a CSPO cannot create a "good faith belief" that the CSPO is no longer in effect; and (3) the credibility of the witnesses lies with the finder of fact – who in this case found neither Ms. Sobeski nor Mr. Conklin credible.

{¶4} The judgment of the Chardon Municipal Court is affirmed.

**Substantive and Procedural History**

{¶5} In early July 2019, Mr. Conklin was charged with two counts of violating a CSPO in violation of R.C. 2919.27, first-degree misdemeanors; one count of domestic violence in violation of R.C. 2919.25(A), a first-degree misdemeanor; and one count of disorderly conduct in violation of R.C. 2917.11(A)(1), a minor misdemeanor. The state later dismissed the count of disorderly conduct.

{¶6} A one-day bench trial was held in which Ms. Sobeski, her 10-year-old son, "C.S.", and two deputies from the Geauga County Sheriff's Office, Deputy Justin Falcone ("Deputy Falcone") and Deputy James R. Hildebrand ("Deputy Hildebrand"), testified for the state, and Mr. Conklin testified in his own defense. The court recalled Deputy Falcone and C.S. as witnesses.

2

{¶7} Ms. Sobeski testified that she was living with Mr. Conklin at the time of the incident; she was "staying with this man, that guy, and my son and I were living over there, but I have a house of my own." Ms. Sobeski further testified that Mr. Conklin woke her up at approximately 11:25 p.m. as he was returning home. Feeling hungry, she went downstairs and microwaved some chicken à la king. She slammed the door of the microwave shut because it did not close all the way, explaining "so I closed it again and then that was the trigger." She continued: "So he came down the steps. From behind he picked me up by the neck, held me in the air, squeezed as hard as could, slammed me to the ground and into the tile floor and into the kitchen cabinets. And then I called to [C.S.] to get 911, to get the phone. [C.S.] handed me the phone. [Mr. Conklin] tried to get the phone away from me and he bear hugged me so hard I have bruises on this side of me, bruises on this side of me, and tried to pry the phone – the phone out of my hands and tried to break my thumb again with prying it out of and I was finally able to get the phone and call 911 after that."

{¶8} Ms. Sobeski further testified that due to a CSPO issued on May 15, Mr. Conklin was not allowed to have any contact with her. Mr. Conklin, however, did make contact after the CSPO was issued and left a note at Ms. Sobeski's parents' house. The note stated, "Call me, unblock me, come get your cat." Ms. Sobeski also testified that she had been living with Mr. Conklin prior to the incidents that led to the CSPO but that she had no contact with him after the CSPO was issued until the day of the incident. A few moments later, however, she testified that approximately two weeks after the CSPO was issued she started seeing Mr. Conklin again and began living with him in early June. She and her son were "staying with" Mr. Conklin on the night in question.

3

{¶9} On cross-examination, Ms. Sobeski testified that she lived "off and on" with Mr. Conklin in 2018, at one point moving in all of her belongings. In December 2018, she moved back to her parents' house and obtained her own apartment. In early 2019, the CSPO proceedings were initiated. After the CSPO was issued in May 2019, Ms. Sobeski and her son traveled with Mr. Conklin to California for "one or two weeks." Ms. Sobeski testified that she did not discuss the CSPO with Mr. Conklin at that time, and she denied telling Mr. Conklin "you were going to go to the court and have that civil protection order dismissed."

{¶10} On the night of the incident, C.S. was playing on his phone upstairs. Ms. Sobeski denied drinking an alcoholic iced tea beverage, "Twisted Tea," and vaping marijuana. She reiterated that Mr. Conklin came "from behind and picked me up by my neck from behind and then he threw me on the floor. That's how I wound up on the floor." She bit his thumb to get away. She denied going upstairs and "beating him up" and further denied that her son told her "to stop beating up" Mr. Conklin. She also denied driving to the end of the driveway and returning to the house to get her alcohol from the refrigerator.

{¶11} C.S. testified that he saw Ms. Sobeski on the floor and gave her his phone to call the police. "She was screaming the stuff, but I don't remember what it was." He saw Ms. Sobeski and Mr. Conklin upstairs – Mr. Conklin was attempting to kiss her and she was pushing him away. He remembers going to his grandmother's house shortly after witnessing the altercation that night. On cross examination, he testified that he had lived with Mr. Conklin for about one year and he did "not really" get along with him. He saw Mr. Conklin following his mother up the stairs, and at one point told her "she probably shouldn't" hit Mr. Conklin, "just like push him away and go somewhere else." He observed his mother drinking Twisted Tea "kind of often."

4

{¶12} The court questioned C.S., who replied that when the incident began Ms. Sobeski was yelling for him to come downstairs and that he had been upstairs playing on his iPad. He gave Ms. Sobeski his phone after calling 911. He saw Ms. Sobeski come up the stairs with Mr. Conklin, who tried to kiss her. Ms. Sobeski pushed him away.

{¶13} Deputy Falcone was one of the officers who investigated the incident. He spoke with Mr. Conklin upon arrival, who told them the incident began with the slamming of the microwave door. Deputy Falcone also recovered firearms from the residence after discovering the CSPO and its requirement that Mr. Conklin could not possess firearms.

{¶14} Deputy Falcone located Ms. Sobeski at her parents' house and spoke with her. She relayed to Deputy Falcone that there was a dispute over the slamming of the microwave door and that Mr. Conklin "grabbed her by the throat and put her in a choke – in a choke hold and slammed her down to the ground."

{¶15} Deputy Falcone also identified Ms. Sobeski's injuries using several photographs he took approximately an hour after the police were called, including Ms. Sobeski's neck and chest area, which showed bruising.

{¶16} Deputy Hildebrand also testified as to the investigation. He was met by Mr. Conklin at Mr. Conklin's residence, who relayed his version of events to the deputy. Deputy Hildebrand discovered there was a CSPO in place, that Ms. Sobeski was the protected party, and that the CSPO contained a "no firearm" provision. The deputies recovered two shotguns and a rifle from Mr. Conklin's residence. Mr. Conklin told the deputies that he had initially followed the CSPO, but he was under the impression from Ms. Sobeski that the CSPO had been lifted, so he brought the firearms, which he had stored at a friend's house, back to his house. Deputy Hildebrand arrested Mr. Conklin for "violation of the protective order, having firearms."

{¶17} Mr. Conklin took the stand in his own defense. He first met Ms. Sobeski very briefly approximately twenty years ago. When he saw her again in 2018, they began dating. Their relationship progressed, and Ms. Sobeski moved in with him later that year. She moved out several months later, however, and the CSPO proceedings were initiated soon after. Shortly after the CSPO hearing, Mr. Conklin contacted Ms. Sobeski regarding her cat, and they rekindled their relationship. He testified that Ms. Sobeski came to live with him despite the CSPO.

{¶18} On the night in question, Ms. Sobeski did not want to go with Mr. Conklin to the Mentor Rocks concert, which they did "every Tuesday night," because Ms. Sobeski "had been drinking * * * and vaping the marijuana vapor[.]" Mr. Conklin has been sober for nineteen years. When Mr. Conklin returned home, C.S. came downstairs and asked him to make him something to eat. Mr. Conklin was trying to be quiet so as to not awaken Ms. Sobeski. Afterward Mr. Conklin tucked C.S. back into bed and went into his bedroom. Ms. Sobeski, who was highly intoxicated, jumped out of bed, and said "I'm hungry. I want to get something to eat."

{¶19} Mr. Conklin went downstairs after she slammed the microwave door, and he asked her, "What did you just do? What are you doing? And she looked at me and she was like, 'I slammed the microwave because it's so hard to close it.' I'm like 'It's not really too hard.' And I put my hands up and that's when I got bit in the finger." In shock and "unbelievable pain," he threw her off of him; "she slid into the cabinets, and my thumb, the blood started coming out of both sides of my thumb instantly the second it came out of her mouth." He testified that Ms. Sobeski began hitting the left side of his body and almost blackened his eye, hitting his face.

6

{¶20} Afterwards, he went upstairs, and Ms. Sobeski "took the food out of the refrigerator, opened the garage door, not the – the mandoor [sic] to walk into the garage and she threw all the Stouffer's food that I bought her all over the inside of my Me[r]cedes convertible, slung it all over the inside." He realized "she's starting to trash the house," and he went downstairs. Ms. Sobeski began hitting him again, "And then I left her and she says she's going. She packed up her clothes, got [C.S.] some clothes, got in her car, her Hummer, pulled it down to the end of the driveway and stopped because she could not back it up, because she was too intoxicated to back that big vehicle up." Mr. Conklin further testified that at that point, Ms. Sobeski came back to the house for her "Twisted Tea," and he waited upstairs, thinking to himself, "Well, I guess I'm just going to wait here for the sheriff deputies to come."

{¶21} On cross-examination, Mr. Conklin denied choking Ms. Sobeski and claimed the red marks in the state's pictures of her neck, chest, and arms were caused when he threw Ms. Sobeski off of him after she bit him and from her hitting him. He stored his three ornamental rifles at a friend's house after the CSPO order was issued but later retrieved them when he thought the order was "lifted." He understood that at the time the CSPO was issued he could not be in possession of firearms or have any contact with Ms. Sobeski. He never received a notice from the court indicating the order was lifted; instead, he took Ms. Sobeski's "word for it."

{¶22} Mr. Conklin testified on redirect examination that once they returned from their California trip, he drove Ms. Sobeski to the Lake County courthouse, where she filed paperwork requesting that the CSPO be vacated.

{¶23} The court recalled Deputy Falcone to the witness stand, asking him if he noticed "any alcohol on [Ms. Sobeski's] person or on her breath when he interviewed

7

her?" Deputy Falcone could not "recall on her breath, but I do remember it was difficult to get her to stay on task to stay in the dining room area where I was talking to her to get her statement. There was a lot of commotion in the house because the Mentor Fire Department was there as well, along with her child, as well as her parents."

{¶24} The court also recalled C.S. to the stand, who upon the court's questioning responded that Mr. Conklin did not make him anything to eat, nor did he request Mr. Conklin to do so.

{¶25} After closing statements, the court announced its findings, stating that "as credibility was an issue in this case, the Court finds Deputy Hildebrand and Deputy Falcone credible. The court finds [C.S.] very credible as he has no agenda in this case. The questions I asked of them was to ascertain the facts. Regardless if Ms. Sobeski pounded on his doors till the cows came home * * * the onus is on him. The protection order specifically says, 'even with the petitioner's permission,' which means if she came back a million times, he still has to shun her away, send her away. Even when he thought she may have dismissed the temporary protection order; he received no notice. In fact, he received a denial that it was to be vacated. The fact that Deputy Falcone even after about an hour, hour and a half of locating where Ms. Sobeski was did not smell alcohol on her person, which means she had the opportunity of between an hour, hour and a half to drink at her parents' house, but there was no smell of alcohol." In conclusion, the court found Mr. Conklin guilty of violating the protection order "as to contact, as to possession of the firearms in his house while the protection order was in full force and effect." It also found him guilty of domestic violence.

{¶26} At the sentencing hearing, the court sentenced Mr. Conklin as follows: on Count (A), R.C. 2919.27, violating a protection order, a fine of $250 and a jail term of 180

8

days of house arrest (due to Mr. Conklin's medical conditions), with 160 days suspended; Count (B), R.C. 2919.27, violating a protection order, a fine of $250 and a jail term of 180 days, with 180 days suspended, consecutive to count (A); on Count (C), R.C. 2919.25, domestic violence, a $250 fine and a jail term of 180 days, with 180 days suspended, concurrent to Count (B); and two years of probation with conditions.

{¶27} Mr. Conklin appealed and now raises three assignments of error:

{¶28} "[1.] The Court's finding of guilt and Appellant's subsequent conviction for domestic violence in violation of ORC 2919.25 is contrary to the manifest weight of the evidence because he and the Complainant were not family or household members; therefore, Appellant's conviction for said count should be overturned, and Appellant should be remanded to the trial court for a new trial.

{¶29} "[2.] The Court's finding of guilt and Appellant's subsequent conviction for violation of ORC 2913.02(A)(1) [sic] is contrary to the manifest weight of the evidence; therefore, Appellant's conviction for said count should be overturned, and Appellant should be remanded to the trial court for a new trial.

{¶30} "[3.] The Court's finding of guilt and Appellant's subsequent conviction for domestic violence in violation of ORC 2919.25 is contrary to the manifest weight of the evidence because he did not cause physical harm to the Complainant; therefore, Appellant's conviction for said count should be overturned, and Appellant should be remanded to the trial court for a new trial."

**Manifest Weight of the Evidence**

{¶31} In all three of Mr. Conklin's assignments of errors, he challenges the manifest weight of the evidence.

9

{¶32} "'When reviewing a claim that a judgment was against the manifest weight of the evidence, an appellate court must review the entire record, weigh both the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that a new trial must be ordered.'" *State v. Rice*, 2019-Ohio-1415, 135 N.E.3d 309, ¶ 81 (11th Dist.), quoting *State v. McFeely*, 11th Dist. Ashtabula No. 2008-A-0067, 2009-Ohio-1436, ¶ 77.

{¶33} "'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against a conviction. * * * The role of the appellate court is to engage in a limited weighing of the evidence introduced at trial in order to determine whether the state appropriately carried its burden of persuasion. * * * The reviewing court must defer to the factual findings of the trier of fact as to the weight to be given to the evidence and credibility of witnesses.'" *Id.* at ¶ 82, quoting *McFeely* at ¶ 78.

## Cohabitation

{¶34} In his first assignment of error, Mr. Conklin argues that the manifest weight of the evidence does not support his conviction for domestic violence because the evidence at trial reflected that he and Ms. Sobeski were not family or household members. Specifically, he argues there was no evidence presented that they shared familial/financial responsibilities or consortium. Instead, Ms. Sobeski testified that she had her own residence, and Deputy Falcone indicated Ms. Sobeski was living in a separate residence, i.e., an apartment in Willoughby.

10

{¶35} Mr. Conklin was convicted of one count of domestic violence in violation of R.C. 2919.25(A), which states "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member."

{¶36} Pursuant to R.C. 2919.25(F)(1), "family or household member" means any of the following:

{¶37} "(a) Any of the following who is residing with or has resided with the offender:

{¶38} "(i) A spouse, a person living as a spouse, or a former spouse of the offender;

{¶39} "(ii) A parent, a foster parent, or a child of the offender, or another person related by consanguinity or affinity to the offender;

{¶40} "(iii) A parent or a child of a spouse, person living as a spouse, or former spouse of the offender, or another person related by consanguinity or affinity to a spouse, person living as a spouse, or former spouse of the offender."

{¶41} R.C. 2919.25(F)(2) defines "person living as a spouse" as "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender *within five years prior to the date of the alleged commission* of the act in question." (Emphasis added.)

{¶42} A review of the evidence and testimony at trial does not support Mr. Conklin's contentions and reveals there was more than enough evidence from which to find that Mr. Conklin and Ms. Sobeski "cohabited * * * within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(2). Ms. Sobeski, C.S., and Mr. Conklin, himself, testified that they had cohabited together for at least several

months during the year before the incident occurred. Ms. Sobeski had moved all of her belongings and those of her son to Mr. Conklin's residence in 2018. At that time, she did not have a separate residence of her own.

{¶43} The case law Mr. Conklin cites fails to support his assertions and are quite opposite to the circumstances herein. In *State v. Cobb*, 153 Ohio App.3d 541, 2003-Ohio-3821 (1st Dist.), the First District found insufficient evidence of cohabitation where the complainant was married to someone else and the appellant maintained his own apartment. *Id.* at ¶ 5-6. In *State v. Humbarger*, 149 Ohio App.3d 30, 2002-Ohio-4160 (3d Dist.), the Third District found insufficient evidence of cohabitation because the victim and the defendant were together for only a three-day visit. There was no evidence to suggest the presence of either the sharing of familial or financial responsibilities and/or consortium. *Id.* at ¶ 11.

{¶44} These cases are clearly distinguishable from the present case -- Ms. Sobeski and Mr. Conklin both testified they had cohabited within the past five years and that, at one point, Ms. Sobeski had relinquished her separate residence, moving all of her and her son's belongings to Mr. Conklin's residence. Further, both testified that they had renewed their relationship shortly after the CSPO was issued, even traveling to California with Ms. Sobeski's son. Indeed, Ms. Sobeski testified that "I was staying with him. We were a couple. He promised me a bright future. I thought I was doing the right thing." Mr. Conklin similarly testified that Ms. Sobeski moved back in with him "a few weeks after that [CSPO] hearing we got back together." When asked if Ms. Sobeski came back to live with him, he testified "that's correct."

{¶45} Given the parties' tumultuous relationship and the timeline of events, we do not find Ms. Sobeski's testimony that she had a separate residence contradictory or

12

difficult to reconcile. Ms. Sobeski and her son moved in with all of their belongings with Mr. Conklin in 2018, which included Ms. Sobeski relinquishing her separate residence. The parties ended their relationship later that year after an incident that resulted in Ms. Sobeski moving in with her parents and later to her own apartment in Willoughby. The CSPO proceedings were initiated, and the two reconciled shortly after the CSPO was issued. Both Ms. Sobeski and Mr. Conklin testified that despite the CSPO order, they were staying together at Mr. Conklin's residence at the time of the altercation, and both testified that they had lived together within the past five years, pursuant to R.C. 2919.25(F)(2).

{¶46} The Ninth District, in *State v. Cornwell*, 2015-Ohio-4617, 48 N.E.3d 169 (9th Dist.), aptly explained that the sharing of familial/financial responsibilities and consortium need only be considered when the complainant and defendant do not share the same residence – or have not shared the same residence in the past five years. *Id.* at ¶ 15. Thus, in *Cornwell*, even though the complainant and the appellant were not living together at the time of the incident, the complainant testified that she was engaged to the appellant and they had lived together within five years prior to the incident in question. *Id.* at ¶ 16. This was sufficient evidence under the statute to establish that she was a household member of the appellant. *Id.* Similarly here, there is no question that at one time period in the past five years, if not on the night of the incident, Ms. Sobeski and Mr. Conklin were "family or household members."

{¶47} Mr. Conklin's first assignment of error is without merit.

### CSPO Violation

{¶48} Mr. Conklin argues in his second assignment of error that the manifest weight of the evidence does not support the court's finding that he violated the CSPO

13

because there was evidence that Ms. Sobeski informed him that the CSPO had been lifted. As a result, Mr. Conklin had "a good faith belief" that he could be in her presence and in possession of firearms without violating the order. Thus, he contends, he could not be convicted of violating a protection order pursuant to R.C. 2919.27.

{¶49} Pursuant to R.C. 2919.27(A)(2), "violating a protection order," "[n]o person shall recklessly violate the terms of * * * [a] protection order issued pursuant to * * * 2903.214 of the Revised Code[.]"

{¶50} Further, pursuant to R.C. 2901.22(C), "[a] person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist."

{¶51} In *State v. Lucas*, 100 Ohio St.3d 1, 2003-Ohio-4778, the Supreme Court of Ohio addressed whether a protected subject of a protection order can be complicit in the violation of a domestic violence civil protection order issued pursuant to R.C. 3113.31 – the logic of which applies equally to this case and the protected person's behavior. *Id.* at ¶ 13. Answering in the negative, the court explained that "[t]he General Assembly both recognizes and addresses the potential problem of a protected party's acquiescence in the violation of a protection order. The General Assembly demonstrates its cognizance of the volatile and mercurial nature of certain interpersonal relationships and insulates protection orders from the heat and chill of shifting emotions. It removes the excuse of an invitation, a perceived invitation, or a concocted invitation from affecting the power of a protection order. The General Assembly has made the issue of an invitation entirely

14

irrelevant as to the culpability of a respondent's violation of a protection order."  *Id.* at ¶ 27.

{¶52}  Further, and in stark contrast to Mr. Conklin's argument and the explicit, written notice he received on the CSPO order, the Supreme Court of Ohio pointed out the following:

{¶53}  "This court, in its Rules of Superintendence, also notes the difference between the treatment of a petitioner and a respondent when a protection order is violated.   Pursuant to Sup.R. 10.01(D) and 10.02(C), all civil and criminal domestic violence protection orders issued by the courts of the state of Ohio contain two sets of warnings—one for the petitioner and one for the respondent—that must be substantially similar to Sup.R. Form 10.01–G.  The Sup.R. Form 10.01–G warning to petitioners reads as follows:

{¶54}  'You **cannot** change the terms of this order by your words or actions.  Only the Court can allow the Respondent/Defendant to contact you or return to your residence. If you and the Respondent/Defendant want to resume your relationship, you **must** ask the Court to modify or dismiss this Protection Order.'  (Emphasis sic.)

{¶55}  "For the respondent, the threat of criminal charges on Sup.R. Form 10.01–G is front and center:

{¶56}  'Only the Court can change this order.  The Petitioner/Alleged Victim cannot give you legal permission to change this order.  If you go near the Petitioner/Alleged Victim, even with the Petitioner's/Alleged Victim's consent, you may be arrested.  If you and the Petitioner/Alleged Victim want to resume your relationship you must ask the Court to modify or dismiss this Protection Order.  You act at your own risk if you disregard this WARNING.'  (Emphasis sic.)

15

{¶57} "The sharp distinction between how the Rules of Superintendence address petitioners and respondents reflects the General Assembly's intention that only one party—the respondent—can be criminally responsible for the violation of a protection order." *Lucas* at ¶ 31-35.

{¶58} Thus, the very text of Mr. Conklin's CSPO warned him against seeing the protected party – even with the protected party's permission. As the court noted below, "The protection order *specifically says*, 'even with the petitioner's permission,' which means if she came back a million times, he still has to shun her away, send her away. Even though she may have dismissed the temporary protection order, he received no notice. In fact, he received a denial that it was to be vacated." (Emphasis added.)

{¶59} Third-party misinformation about the status of a court order, in this case, from the protected party of the CSPO, does not create a "good faith belief" that a court order has been dissolved. As the court below so aptly stated, the "onus" is on Mr. Conklin to determine whether an order against him is active, typically through simple communication with the court that issued the order. Whether Ms. Sobeski testified that she filed a motion to dissolve the CSPO and/or told Mr. Conklin that the order was dissolved is irrelevant.

{¶60} Mr. Conklin's second assignment of error is without merit.

**Credibility of the Witnesses**

{¶61} In his third assignment of error, Mr. Conklin contends the manifest weight of the evidence does not support his conviction for domestic violence in violation of R.C. 2919.25 because he and the complainant presented competing versions of the incident. He argues his version is more believable because Ms. Sobeski is not a credible witness. There was evidence by way of his own testimony and that of Deputy Falcone that Ms.

16

Sobeski was intoxicated on the night of the incident. Deputy Falcone testified that although he "didn't recall Ms. Sobeski's breath," he found it difficult for Ms. Sobeski to "stay on task." Further, Mr. Conklin was merely acting in self-defense when he threw Ms. Sobeski off him after she bit his finger.

{¶62} A review of the trial transcript reveals the court did not find either Ms. Sobeski or Mr. Conklin credible in this case. The court explained that it found Deputy Hildebrand, Deputy Falcone, and C.S. credible in this case and that "the questions [the court] asked of them was to ascertain the facts." As to Mr. Conklin's allegations that Ms. Sobeski was intoxicated, the court remarked that "[t]he fact that Deputy Falcone even after about an hour, hour and a half of locating where Ms. Sobeski was did not smell alcohol on her person, which means she had the opportunity of between an hour, hour and a half to drink at her parents' house, but there was no smell of alcohol."

{¶63} There is nothing to suggest the court so lost its way or created a manifest miscarriage of justice. The state carried its burden of proof as the sufficiency of the evidence, and the manifest weight of the evidence supports Mr. Conklin's convictions. Notwithstanding the testimony of Ms. Sobeski and Mr. Conklin, there was evidence from Deputy Falcone, Deputy Hildebrand, and C.S. from which the court could find Mr. Conklin committed an act of domestic violence and violated his CSPO by having contact with Ms. Sobeski and possessing firearms.

{¶64} "'It is well-settled that when assessing the credibility of witnesses, "[t]he choice between the credibility of witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." * * * Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict.'"

17

*Rice, supra,* at ¶ 84, quoting *McFeely, supra,* at ¶ 81; *State v. Awan,* 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶65}  We have stated numerous times that the court is free to believe the version of events presented by the evidence and the state.  Competing versions of events does not equate to a verdict unsupported by the evidence.

{¶66}  Mr. Conklin's third assignment of error is without merit.

{¶67}  The judgment of the Chardon Municipal Court is affirmed.


CYNTHIA WESTCOTT RICE, J.,

MATT LYNCH, J.,

concur.