[Cite as *State v. Simpson*, 2024-Ohio-2378.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2023-CA-51 |
| | : | |
| v. | : | Trial Court Case Nos. 22-CR-0702; |
| | : | 22-CR-0767 |
| WALTER SIMPSON | : | |
| | : | (Criminal Appeal from Common Pleas |
| Appellant | : | Court) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on June 21, 2024

. . . . . . . . . . .

THOMAS W. KIDD, JR., Attorney for Appellant

ROBERT C. LOGSDON, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Defendant-Appellant Walter Simpson appeals from his convictions in two cases in the Clark County Court of Common Pleas after he was found guilty of rape, aggravated burglary, kidnapping, and violating a protection order. He was sentenced to

an aggregate term of 30-35½ years in prison. For the reasons that follow, the judgments of the trial court will be affirmed.

## I. Facts and Procedural History

{¶ 2} Simpson and M.F. had an on-again / off-again relationship for some time, and by August 2022, the relationship appeared to be over. On August 19, 2022, M.F. was granted a civil stalking protection order against Simpson. He appeared at the hearing and consented to the order which, among other things, stated that he "shall not initiate or have any contact with the protected person * * * or their residence[.]"

{¶ 3} Around 4 p.m. on August 21, 2022, M.F., her mother, and her baby went to her condo on Reno Lane in Springfield to collect personal items, as M.F. was moving back in with her parents. M.F.'s mother parked in the back of the building, where the detached garage was located, so they could easily load the items that were stored in there. When she tried to open the garage, it did not work; M.F. went around to the front door to enter that way. Her mother and baby remained in the car.

{¶ 4} M.F. walked through the condo and into a patio area between the house and the garage, but as she was about to open the door to the garage, Simpson appeared, grabbed her, forced her back into the house, and commanded her to take off her clothes. According to her testimony, Simpson dragged M.F. to the bedroom, pushed her onto the bed, held her down, and raped her. She further testified that when she resisted, Simpson punched her in the face.

{¶ 5} Meanwhile, M.F.'s mother became concerned when M.F. had not returned to the car after 35 to 40 minutes. She tried knocking on the front door and calling M.F.'s

name through the windows. When M.F. did not respond, she called 911. Deputies soon arrived. They, too, pounded on the door and yelled for M.F.; finally, after several minutes, M.F. rushed out the front door and told them Simpson was running through the house and would soon exit the back through the garage. Clark County Deputies Holly Risner and Joe Johnson quickly found Simpson rushing out of the garage. He was detained and thereafter arrested.

{¶ 6} After securing Simpson, deputies spoke with M.F., who recounted her ordeal. She was then taken to the hospital where she underwent a sexual assault exam. Simpson's DNA was found in vaginal swabs taken as part of the investigation.

{¶ 7} Simpson was initially indicted on rape, kidnapping, and aggravated burglary charges in Clark C.P. No. 22-CR-702. He was later indicted in a separate case for violating a protective order as well (Clark C.P. No. 22-CR-767). The cases were consolidated for trial in November 2022. After a competency evaluation found Simpson to be competent, the cases proceeded to a jury trial on September 12, 2023. The two-day trial included testimony from Deputies Risner and Johnson, Detective Darlene Grogg, M.F.'s mother, and M.F. Simpson testified on his own behalf. The jury also considered more than two dozen exhibits, including pictures of the condo and M.F.'s injuries, the results of the sexual assault examination, the protection order, and the deputies' body camera and interview videos. After several hours of deliberations, the jury returned guilty verdicts on all counts.

{¶ 8} A week later, Simpson appeared for disposition. He was sentenced to an aggregate sentence of 30 to 35½ years in prison.

{¶ 9} Simpson has filed a timely appeal and raises two assignments of error.

## II.    Sufficiency and Manifest Weight of the Evidence

{¶ 10} In his first assignment of error, Simpson contends that the guilty verdicts were not based on sufficient evidence and were against the manifest weight of the evidence. We disagree.

{¶ 11} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 2010-Ohio-5160, 946 N.E.2d 762, ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A conviction based on legally insufficient evidence constitutes a denial of due process and will bar a retrial. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1997).

{¶ 12} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175,

485 N.E.2d 172 (1st Dist.1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs *heavily* against the conviction.' " (Emphasis added.) *Id.* "When engaged in this limited reweighing, the appellate court may not merely substitute its view for that of the trier of fact[.]" *State v. Thompson*, 10th Dist. Franklin No. 16AP-812, 2017-Ohio-8375, ¶ 25.

{¶ 13} "It is well-established that when conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony." *In re M.J.C.*, 12th Dist. Butler No. CA2014-05-124, 2015-Ohio-820, ¶ 35. This Court has said that it "will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of fact lost its way in arriving at its verdict." *State v. Smith*, 2d Dist. Montgomery No. 25462, 2013-Ohio-5345, ¶ 16.

{¶ 14} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11. *Accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v. Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

Rape

{¶ 15} To secure a conviction for rape, the State had to prove that Simpson engaged in sexual conduct with M.F. by compelling her to submit by force or threat of force. R.C. 2907.02(A)(2). Sexual conduct is "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A).

{¶ 16} M.F. testified that Simpson "came at [her] and grabbed [her] and drug [her] back into the kitchen area and while he was doing that he said 'take off your panties and your pants.' " Trial Tr. at 135. She went on to explain that, once in the bedroom, Simpson pushed her onto the bed, pulled her pants off, held her down, and inserted his penis into her vagina. Trial Tr. at 137-138. Throughout the ordeal, M.F. told Simpson that she did not want to have sex, but he would not stop. "I tried to sit up a couple times and he pushed me back down on the bed and he said, 'you be quiet or I'm going to kill you.' And then after that happened a few times, that's when he punched me on the right side of my eye." Trial Tr. at 138-139.

{¶ 17} Simpson's story was quite different. He testified that M.F. had invited him over that day, and they had consensual sex. That version, though, contradicted what M.F. recounted and the testimony of other witnesses who told the jury that, when M.F. escaped through the front door, "she was real frantic like" and "she was crying. She was pretty hysterical." Trial Tr. at 102, 116. Detective Grogg recounted that M.F. was "worked up and nervous and shaky." Trial Tr. at 158.

Although there were conflicting accounts of the incident, that does not mean that the jury lost its way when it found Simpson guilty. "The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). It is evident in this case that the jury believed Simpson had forced M.F. to have vaginal intercourse against her will. Such a finding did not create a manifest miscarriage of justice.

Kidnapping

{¶ 18} As to kidnapping, the State had to establish that Simpson, by force, threat, or deception, removed M.F. from a place she was found or restrained her liberty to engage in sexual activity with M.F. against her will. R.C. 2905.01(A)(4).

{¶ 19} M.F. testified: "As I went on the patio area getting ready to walk in, open up the door to the garage, that's when Walter was there and he came at me and he grabbed me and drug me back into the kitchen area and while he was doing that he said, 'take off your panties and your pants.' " Trial Tr. at 135. According to M.F., Simpson used force to remove M.F. from the patio to the kitchen and then to take her to the bedroom, where he had intercourse with her. He also restrained M.F.'s liberty by holding her down on the bed.

{¶ 20} M.F.'s trial testimony also indicated that she had not wanted to engage in sex with Simpson that day. The following exchange with the prosecutor was illustrative.

Prosecutor:   Did you tell him you wanted to have sex with him that day?

M.F.:          No.

Prosecutor: In fact, did you tell him no?

M.F.: I did.

Prosecutor: Do you know how many times you told him no?

M.F.: Several times.

Trial Tr. at 138.

{¶ 21} Based on the evidence presented at trial, we cannot say the jury lost its way when it found Simpson guilty of kidnapping.

Aggravated Burglary

{¶ 22} R.C. 2911.11(A)(1) states that "[n]o person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense" and the offender "inflicts, or attempts or threatens to inflict physical harm on another."

{¶ 23} Simpson's only argument here is that he was not trespassing at M.F.'s condo on August 21 because he had been invited. And while that was his testimony, M.F. told the jury that she had not contacted Simpson in any way after the August 19 final protection order hearing and that she had not expected him to be there when she arrived. Further, Detective Grogg testified that she examined M.F.'s phone and did not find evidence that she had contacted Simpson.

{¶ 24} As to the other important element of the crime -- that the offender inflicts, attempts or threatens to inflict physical harm -- the evidence was overwhelming. M.F. testified that Simpson punched in the face on the right side of her eye. This was supported

by testimony from multiple witnesses. Detective Grogg stated that M.F. had marks on her face, M.F.'s mother noted that her daughter had not had any marks or bruising on her face when she went inside but did upon exiting, and even Simpson admitted to hitting M.F. (although he claimed it was in self-defense). The State also presented multiple photographs showing injuries to M.F.'s face. Exhibits 13-21. Finally, M.F. testified that Simpson had threatened to kill her if she would not stay quiet.

Violating a Protection Order

**{¶ 25}** Lastly, Simpson argues that his conviction for violating a protection order was unsupported by the evidence and against the manifest weight of the evidence. For a violation of R.C. 2919.27(A)(1), the State had to demonstrate that Simpson recklessly violated the terms of a protection order or consent agreement.

**{¶ 26}** It is undisputed that there was a civil stalking protection order (R.C. 2903.214) against Simpson and that he had consented to it. Exhibit 24, 25; Trial Tr. at 103, 104, 195, 196, 210, 214. He argued, though, that he did not violate the order because M.F. invited him over. This claim is unavailing.

**{¶ 27}** The document itself stated in several places that the petitioner (M.F.) could not give legal permission to violate the order. On the first page, in a section titled "Warning To Respondent/Defendant," it stated: "The Petitioner * * * cannot give you legal permission to change this order. If you go near the Petitioner * * *, even with the person's permission, you may be arrested. Only the Court may change or end this Protection Order." Exhibit 24. On the same page, in the section entitled "Warning to Petitioner/Alleged Victim," the order read: "Only the Court may allow the

Respondent/Defendant to contact you or return to your residence. This Protection Order cannot be changed by either party without obtaining a court order." Finally, on the third page of the document, it stated: "Respondent shall not initiate or have any contact with the protected person * * * or their residence[.]"

{¶ 28} Ohio courts have also weighed in on the issue, concluding that an invitation does not negate the power of a protection order. The Ohio Supreme Court has held that "[the statute] removes the excuse of an invitation, a perceived invitation, or a concocted invitation from affecting the power of a protection order. The General Assembly has made the issue of an invitation entirely irrelevant as to the culpability of a respondent's violation of a protection order." *State v. Lucas*, 100 Ohio St.3d 1, 2005-Ohio-4778, 795 N.E.2d 642, ¶ 27. *Accord State v. Davison*, 4th Dist. Ross Nos. 04CA2771, 04CA2773, 2004-Ohio-6828 (a respondent violates a protection order even if invited).

{¶ 29} There was a protection order in place protecting M.F. from Simpson, and Simpson violated it when he went to M.F.'s condo and made contact with her. The final element to complete the crime was that a felony must be committed while violating the protection order. In this case, Simpson committed three – rape, kidnapping, and aggravated burglary. The jury did not lose its way when it found Simpson guilty of violating a protection order.

{¶ 30} The first assignment of error is overruled.

### III.    Sentencing

{¶ 31} Simpson argues in his second assignment of error that the trial court erred in sentencing him to more than three decades in prison. He specifically claims that the

"consecutive aggregate sentence * * * was [un]supported by the evidence." Appellant's Brief at 11.

{¶ 32} In general, it is presumed that prison terms will be served concurrently. R.C. 2929.41(A); *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 16, 23 ("judicial fact-finding is once again required to overcome the statutory presumption in favor of concurrent sentences"). However, after determining the sentence for a particular crime, a sentencing judge has discretion to order an offender to serve individual counts of a sentence consecutively to each other or to sentences imposed by other courts. *State v. Dillon*, 2d Dist. Greene No. 2020-CA-4, 2020-Ohio-5031, ¶ 44.

{¶ 33} R.C. 2929.14(C)(4) permits a trial court to impose consecutive sentences if it finds that (1) consecutive sentencing is necessary to protect the public from future crime or to punish the offender, (2) consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and (3) any of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses

of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶ 34} Simpson does not seem to argue that the trial court failed to make the required findings to impose consecutive sentences, but rather that "[t]he trial court was lacking in its sentencing analysis." We take that to mean he challenges the validity of those findings. His argument depends on this Court's engaging in a de novo review of the record, something the legislature and Ohio Supreme Court have clearly stated we cannot do.

{¶ 35} "The plain language of R.C. 2953.08(G)(2) requires an appellate court to defer to the trial court's consecutive-sentence findings, and the trial court's findings must be upheld unless those findings are clearly and convincingly not supported by the record." *State v. Gwynne*, 173 Ohio St.3d 525, 2023-Ohio-3851, 231 N.E.3d 1109, ¶ 5. *See also State v. Norris*, 2d Dist. Greene No. 2023-CA-8, 2023-Ohio-4057, ¶ 13 (an appellate court cannot reverse consecutive sentences unless it clearly and convincingly finds the record does not support the trial court's findings); *State v. Williams*, 2d Dist. Champaign No. 2022-CA-29, 2024-Ohio-1707, ¶ 19.

{¶ 36} Our authority is limited to detecting *something* in the record that supported the trial court's findings. As long as the findings were not clearly and convincingly unsupported, we must affirm.

{¶ 37} The record in this case contains Simpson's criminal history, which included

two convictions for drug-related offenses (in Florida and Ohio); the Ohio conviction was a 2021 felony conviction for aggravated possession of drugs out of Champaign County, for which he served 11 months in prison. Simpson also had prior misdemeanor convictions for assault and violation of a protection order in a 2022 case involving M.F. The trial court also had M.F.'s victim impact statement to consider. In it, she described the challenges she has faced since the attack, including having to sell her condo due to the anxiety she felt from being in it alone, the fear she has about starting a new romantic relationship, and the embarrassment and shame she felt in going out in public with a black eye after the incident.

{¶ 38} Based on the record before us, we cannot say the trial court's findings were clearly and convincingly unsupported by the record. Simpson's second assignment of error is overruled.

### IV.     Conclusion

{¶ 39} The judgments of the trial court will be affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.