**FILED**

May 25 2023, 8:38 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Daniel A. Dixon
Lawrence County Public Defender
Agency
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Indiana Attorney General

Steven J. Hosler
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Dustin A. Lane,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff* | May 25, 2023<br><br>Court of Appeals Case No.<br>22A-CR-2276<br><br>Appeal from the Lawrence<br>Superior Court<br><br>The Honorable John M. Plummer,<br>III, Judge<br><br>Trial Court Cause No.<br>47D01-2201-CM-113 |

**Opinion by Judge Crone**
Judge Robb concurs.
Judge Kenworthy dissents with separate opinion.

**Crone, Judge.**

## Case Summary

Dustin A. Lane appeals the 3,000-day aggregate sentence imposed by the trial court following his guilty plea to ten counts of class A misdemeanor invasion of privacy. He asserts that his sentence is inappropriate in light of the nature of the offenses and his character. Concluding that he has met his burden to demonstrate that his sentence is inappropriate, we revise his sentence and remand to the trial court with instructions.

## Facts and Procedural History

In 2018, Lane was convicted of level 6 felony domestic battery resulting in moderate bodily injury. The trial court issued a no-contact order prohibiting him from direct or indirect contact with the victim, his ex-wife A.N. While that order was still in place, between March 2020 and September 2021, Lane sent separate letters, approximately one per month, to A.N. Lane sent the letters while he was still incarcerated in the Indiana Department of Correction (DOC) serving his sentence for domestic battery. The letters primarily addressed questions about the parties' children. A.N. responded to Lane's letters at least six times. As noted by the trial court, this created a back-and-forth dialogue between Lane and A.N. A.N. never requested that Lane cease corresponding with her through these letters.

Lane sent his last letter to A.N. on September 20, 2021. Several months later, on January 13, 2022, A.N. reported the letters (and that they violated the no-contact order) to the police. Thereafter, the State charged Lane with ten counts

of class A misdemeanor invasion of privacy. Lane pled guilty to all charges pursuant to a plea agreement that left sentencing to the trial court's discretion. Following a hearing, the trial court sentenced Lane to consecutive 300-day sentences on each count, to be served in the DOC, for an aggregate executed sentence of 3,000 days. During the same hearing, Lane admitted that he violated his probation on his domestic battery conviction by committing invasion of privacy. Accordingly, the trial court revoked his probation and ordered him to serve 730 days of his previously suspended sentence consecutively to his 3,000-day sentence. Lane now appeals the 3,000-day sentence.

## Discussion and Decision

[4] Lane asks us to revise his sentence pursuant to Indiana Appellate Rule 7(B), which states, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Lane bears the burden to show that his sentence is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g* 875 N.E.2d 218. When reviewing a sentence, our principal role is to leaven the outliers rather than necessarily achieve what is perceived as the correct result in each case. *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). "We do not look to determine if the sentence was appropriate; instead we look to make sure the sentence was not inappropriate." *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012). "[S]entencing is principally a discretionary function in which the trial

court's judgment should receive considerable deference." *Cardwell*, 895 N.E.2d at 1222. As we assess the nature of the offenses and character of the offender, "we may look to any factors appearing in the record." *Boling v. State*, 982 N.E.2d 1055, 1060 (Ind. Ct. App. 2013). Ultimately, whether a sentence should be deemed inappropriate "turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case." *Cardwell*, 895 N.E.2d at 1224.

[5] Although Rule 7(B) requires us to consider both the nature of the offense and the character of the offender, the appellant is not required to prove that each of those prongs independently renders his sentence inappropriate. *Connor v. State*, 58 N.E.3d 215, 218 (Ind. Ct. App. 2016). Rather, the two prongs are separate inquiries that we ultimately balance to determine whether a sentence is inappropriate. *Id.* at 219; *see State v. Stidham*, 157 N.E.3d 1185, 1195 (Ind. 2020) (balancing prongs and concluding that character of offender outweighed egregious nature of offenses in favor of sentence revision).

[6] First, we acknowledge that a review of Lane's character does not weigh in favor of sentence revision. An offender's character is shown by his "life and conduct." *Adams v. State*, 120 N.E.3d 1058, 1065 (Ind. Ct. App. 2019). This assessment includes consideration of the defendant's criminal history. *Johnson v. State*, 986 N.E.2d 852, 857 (Ind. Ct. App. 2013). Lane has a substantial criminal history including seven prior felony convictions. This includes convictions for domestic battery, criminal confinement, sexual misconduct with a minor, criminal recklessness, and dealing in methamphetamine. Lane's criminal

history demonstrates his clear and continuing disregard for the rule of law, which reflects negatively on his character. And although we view in a positive light that Lane accepted responsibility for his behavior in pleading guilty to his crimes, the current crimes were committed while he was incarcerated, which demonstrates a disdain for authority that reflects poorly upon him. In sum, when viewed in isolation, there is nothing about Lane's character that would sway us to find that the sentence imposed by the trial court was inappropriate.

[7] The nature of Lane's offenses, on the other hand, persuades us that the trial court simply went too far in imposing ten consecutive close-to-maximum 300-day sentences for these class A misdemeanors. *See* Ind. Code § 35-50-3-2 (providing that maximum sentence for one class A misdemeanor is one year).[1] When reviewing the nature of the offenses, this Court considers the "details and circumstances surrounding the offense[s] and the defendant's participation therein." *Morris v. State*, 114 N.E.3d 531, 539 (Ind. Ct. App. 2018), *trans. denied* (2019). The record demonstrates that, while incarcerated, Lane wrote letters to his ex-wife A.N. ten times in violation of a no-contact order. The content of the letters was nonthreatening and primarily revolved around questions about the parties' children. A.N. did not object to Lane's violations of the no-contact

---

[1] Although we acknowledge that there is no statutory cap on the aggregate length of consecutive sentences imposed for misdemeanor offenses, just for comparison, had Lane been convicted of multiple level 6 felony offenses arising out of an episode of criminal conduct, the total term of imprisonment he could have received could not have exceeded four years. *See* Ind. Code § 35-50-1-2(d)(1) (providing that if "the most serious crime for which the defendant is sentenced is a Level 6 felony, the total consecutive terms of imprisonment may not exceed four (4) years.").

order when she responded to the letters at least six times, encouraging and engaging Lane in a back-and-forth dialogue. Moreover, it does not appear from the record that A.N. ever asked Lane to stop the correspondence. A.N. did not report any of Lane's violations of the no-contact order until January of 2022, four months after receiving the last letter, when Lane was nearing his release date from the DOC.[2]

[8]     All in all, Lane's letter writing resulted not only in ten consecutive 300-day sentences, but also in the revocation of his probation and execution of 730 days of his previously suspended sentence, to be served consecutively to these misdemeanor sentences. While by no means do we condone Lane's repeated violations of the trial court's no-contact order, upon balancing the relatively nonthreatening nature of these violations and Lane's character, we are persuaded that the trial court's 3,000-day aggregate executed sentence is inappropriate.

[9]     The dissent obviously has sincere and strongly held beliefs about domestic violence. And while no one on this Court condones violence in any context, this is not a case of a domestic violence conviction. This case involves a review of the sentence imposed for ten misdemeanor counts of invasion of privacy.

---

[2] We are not suggesting that A.N. waited to report the letters until she became aware that Lane was nearing his release date from prison in order to thwart visitation. But the fact that she did not request that her ex-husband cease communications or report her fears to the prosecutor until after such an extended time period are simply factors that we review in judging the severity of Lane's conduct. Contrary to the dissent's position, it is Lane's conduct of sending these letters, and the impact that conduct had on A.N., for which he should be punished, and not for prior injuries A.N. may have suffered.

Our well-settled function in a 7(B) review is to leaven the outliers and apply the law in a dispassionate and evenhanded manner. Lane was sentenced to serve an aggregate executed term of ten and a half years in the Department of Correction for writing ten nonthreatening letters to his ex-wife primarily asking about the kids.[3] We are guided in appellate review to focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count. *Cardwell*, 895 N.E.2d at 1225. When we look at the "forest," as opposed to the "trees" here, Lane's aggregate sentence is an outlier that simply cannot stand.[4]

[10]   In revising a sentence, "there is no right answer in any given case." *Stidham*, 157 N.E.3d at 1197 (citation omitted). Rather, our review and revision ultimately boils down to our collective sense of what is appropriate. *Id*. We conclude that Lane's ten 300-day sentences should be served concurrently.

---

[3] As already noted, Lane received a sentence in excess of eight years for the invasion of privacy counts, and, for that same conduct, the trial court revoked his probation and ordered him to serve 730 days of his previously suspended sentence.

[4] It is worth noting that, in the last two months, this same panel of judges, including the dissenting judge, has affirmed a case involving a violent rape of a child where the trial court imposed a two-year executed sentence, *see Luckey v. State*, No. 22A-CR-2609, 2023 WL 2657538 (Ind. Ct. App. Mar. 28, 2023), and a case involving level 6 felony domestic violence resulting in actual physical injury, and a defendant with a much worse criminal history, where the trial court imposed a two-and-a-half-year executed sentence. *See Harman v. State*, No. 22A-CR-2285, 2023 WL 3162147 (Ind. Ct. App. May 1, 2023). In contrast, the dissenting judge also authored a case involving a female domestic batterer, in fact a serial batterer against the same victim, who received a one-year executed felony sentence to be served in community corrections. *See Sandoval v. State*, No. 22A-CR-1819, 2023 WL 3329641 (Ind. Ct. App. May 10, 2023). The glaring inconsistency of these recent cases to the current case illustrates just how much of an outlier the executed sentence imposed in this case is.

Thus, we revise his aggregate sentence from 3,000 days to 300 days and remand to the trial court to enter a sentencing order consistent with this opinion.

[11] Remanded.

Robb, J., concurs.

Kenworthy, J., dissents with separate opinion.

**Kenworthy, Judge, dissenting.**

[12] I cannot join the majority in revising Lane's sentence. Here, Dustin Lane used the prison mail system to commit ten distinct criminal offenses against the same victim. Indeed, Lane repeatedly violated a no-contact order designed to protect A.N. while Lane was (1) in prison for committing Level 5 felony criminal confinement against A.N., resulting in her bodily injury,[5] and (2) facing a suspended sentence in a separate cause for committing Level 6 felony domestic battery against A.N., where Lane had "grabbed [A.N.], dr[agged] her, hit her repeatedly in the ribs, the back, her legs, strangled her, pushed her down, and dr[agged] her down a hallway." *Tr. Vol. 2* at 44.

[13] In reflecting on Lane's relentless criminal conduct against her—involving nearly two decades of abuse—A.N. recalled "press[ing] charges back in August of 2018,[6] and [Lane] was arrested on a Friday, and the judge let him out on his own recognizance that following Monday"; he "was right back at [her] house manipulating and intimidating [her], taunting [her]. Letting [her] know there was nothing [she] could do." *Id.* at 42–43. And here we are again.

---

[5] The appellate record does not disclose the details of this prior criminal offense. However, the INcite case-management system shows that in July 2018, in Cause No. 47D01-1807-F5-1113, the State charged Lane with (1) Level 5 felony criminal confinement against A.N., resulting in bodily injury; (2) Level 6 felony strangulation against A.N.; and (3) Class A misdemeanor domestic battery against A.N. Pursuant to a plea agreement, Lane pleaded guilty to Level 5 felony criminal confinement; the other charges were dismissed.

[6] It appears the State filed charges in July 2018 rather than August 2018.

[14] In choosing to write A.N., Lane anticipated his impending release from prison and he knew "[h]is family w[ould] not be there to support him[.]" *Id.* at 41. Lane also knew there was a no-contact order prohibiting him from contacting A.N.[7]—an order that simultaneously protected A.N. from Lane's strategic communications. Disregarding the order, Lane began writing letters to A.N. Indeed, from March 2020 through September 2021, Lane wrote to A.N. about once per month, sending A.N. at least ten letters while he was in prison.[8]

[15] Initially, A.N. responded. Then A.N. realized Lane had led her down this insidious path before. A.N. detailed how Lane would gain power over her, and how she recognized Lane's "manipulation tactics" at work in the letters. *Id.* at 41. She explained how Lane's communications would "start out fine at first." *Id.* But at some point, Lane would add undercurrents of blame, trying to make A.N. feel "this is all [her] fault." *Id.* Eventually, Lane would exert control over A.N., relaying "his expectations of how things would be once he . . . is released." *Id.* As A.N. put it, the letters reflected the "same cycle [she had] seen through the years of . . . domestic abuse" inflicted by Lane. *Id.*

---

[7] When Lane pleaded guilty, Lane initially equivocated about his knowledge of the scope of the no-contact order; Lane indicated he thought there was an exception allowing him to contact A.N. to set up visitation with his children while he was in prison. The trial court took the initiative—"in all fairness to Mr. Lane"—to "listen[] to the entire divorce hearing" in chambers with counsel present. *Id.* at 33. After listening to the recording, the trial court told Lane: "[N]owhere in there does the Court ever say that you're allowed to contact A.N. to set up the visitation." *Id.* The trial court noted that, although there was a conversation about visitation, the conversation indicated that visitation "was going to be facilitated with [Lane's] mom not through [A.N.]. So there was never any conversation in that hearing about [Lane] having permission to talk to A.N. about that." *Id.* at 34. Thereafter, Lane admitted he knowingly violated the no-contact order.

[8] At the sentencing hearing, there was evidence of fourteen separate letters Lane wrote to A.N.

A.N. knew Lane and his communication patterns well, explaining:

> I have been entangled with Dustin Lane . . . for the last 18 years. In those 18 years, we have been married and divorced twice, had two children, separation, several arrest[s], relocations, rehabilitations, relapse, new beginnings, and many endings. We have argued, fought, moved, lost everything, started over more times than . . . I can count.

*Id.* A.N. spoke about how "[t]he abuse started back in [the] first year [they] were together, the manipulation, intimidation, fear, physical, mental, and emotional abuse." *Id.* at 41–42. She gave examples: "He has told me he will always be watching me and knows my every move, making me feel like I would and will need to watch over my shoulder everywhere I go, even in my own home. He has told me he would kill me or kill my family while I watched." *Id.* at 42. "He has become my family's dictator. He has slashed my tires, beat me many, many times. Our children's presence is not a deterrent." *Id.* She spoke about how, at times, Lane would "use the Bible to twist anything and everything" she said, or "bend the words" of scripture "to suit him." *Id.*

A.N. explained how she recognized this "same cycle" manifesting in Lane's letters. *Id.* at 41. She spoke about how, although she at first wrote back, upon recognizing the strategic nature of Lane's communications, she "decided not to respond to the manipulation tactics." *Id.* A.N. also spoke about how Lane was using similar communication techniques with their children, beginning to "set the tone with his expectations of them as well, how they can support him, how

they can be there[.]" *Id.* at 43. She spoke about how their eldest daughter continued to cope with trauma that "mainly circl[ed] around" Lane. *Id.*

[18] The State charged Lane with the ten counts of invasion of privacy at issue here,[9] and Lane pleaded guilty. In sentencing Lane, the trial court imposed 300 days for each count. The court ran those sentences consecutive to one another, for an aggregate sentence of 3,000 days—just over eight years in the Indiana Department of Correction. It is undisputed the offenses were not part of a single episode of criminal conduct; rather, each letter was a distinct invasion of A.N.'s privacy. It is also undisputed the sentence imposed by the trial court is authorized by statute. *See* Ind. Code §§ 35-50-3-2 (authorizing a sentence of up to one year for a Class A misdemeanor) & 35-50-1-2(c) (authorizing consecutive sentences); *Dunn v. State*, 900 N.E.2d 1291, 1292 (Ind. Ct. App. 2009) (noting there is no statutory cap on the aggregate length of consecutive sentences imposed for misdemeanor offenses). Further, the trial court's sentence accounts for (1) A.N.'s victim statement, (2) Lane's repeated criminal conduct directed toward A.N. through his strategic letter-writing, and (3) Lane's poor character evinced through his significant criminal history, egregious abuse of A.N. spanning eighteen years, and violence against others. *See, e.g.*, *Tr. Vol. 2* at 56 (entering a sentencing statement and acknowledging the cyclical nature of domestic violence: "Sometimes it looks like it's very 'nice talking' to try to lure

---

[9] The State noted that although it ultimately decided to bring ten counts of invasion of privacy, Lane could have faced additional counts because he violated the no-contact order more than ten times. *See id.* at 45.

the victim back in to try to re-establish the relationship only for it to all go south again when those behaviors re-emerge[.]"); *see also, e.g.*, *id.* at 42 (giving a victim statement, recounting seeing Lane "gash his mother's head open off a wall clock, giving her a concussion," and "dragg[ing] [his mother] across a driveway by the hair embedding rocks into her knees and gashing them open along the way[,] with [A.N.] in the other hand . . . and [their] daughter witnessing it all").

## Discussion of Majority Approach

[19]  Despite Lane's relentless criminal conduct—and evidence Lane was trying to regain power over A.N. and thereby reinitiate the cycle of domestic violence—the majority reduces Lane's sentence by 90%, transforming Lane's sentence from 8.2 years to just ten months.  In doing so, the majority acknowledges "a review of Lane's character does not weigh in favor of sentence revision."  *Supra* at 4.  Rather, revision hinges on the nature of Lane's latest criminal conduct, *i.e.*, revictimizing A.N. by invading her privacy and writing letters with emotionally charged content and disturbing undercurrents.  *See, e.g., Ex. (Elec.)* "SAM_5562.JPG" (writing to A.N.; criticizing her parenting skills; telling A.N. she is "emotionally and psychologically abusive"; and noting that, although he forgives her for certain things, he does not forgive her for others).  The majority implicitly determines the nature of these crimes was innocuous enough to make Lane the "rare and exceptional" defendant deserving a revised sentence under Rule 7(B).  *Livingston v. State*, 113 N.E.3d 611, 612 (Ind. 2018) (per curiam); *see also Taylor v. State*, 86 N.E.3d 157, 165 (Ind. 2017) (explaining how our

Supreme Court "sparingly" applies power under Rule 7(B), pointing out that, as of late 2017, the Court "revised sentences only six times in the last five years").

[20] But I cannot say Lane deserves appellate grace. Rather, in light of (1) Lane's especially poor character reflected through his history of violence and apparent disdain for the law, (2) his repeated victimization of A.N. spanning eighteen years, (3) alarming content in Lane's letters, and (4) evidence showing Lane was strategically attempting to regain control over A.N., I find no evidence so compelling as to support sentence revision. Rather, for these reasons and those set forth below, I would defer to the trial court and affirm the sentence imposed.

## Nature of the Offenses

[21] First, to disturb a sentence based on the nature of the criminal offenses, an appellate court must identify "compelling evidence portraying the nature of the offense[s] in a positive light." *Ramirez v. State*, 174 N.E.3d 181, 202 (Ind. 2021).[10] Our Supreme Court has given three examples of compelling evidence, *i.e.*, evidence the criminal conduct was "accompanied by restraint, regard, and lack of brutality." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015); *see also Helsley v. State*, 43 N.E.3d 225, 228 (Ind. 2015) (again giving these examples).

---

[10] At the Court of Appeals, there is division about whether Rule 7(B) requires that *both* the nature of the offense and the character of the offender support sentence revision. *See, e.g.*, *Moon v. State*, 110 N.E.3d 1156, 1163–64 (Ind. Ct. App. 2018) (Crone, J., concurring in part and concurring in result in part) (disagreeing with the statement in the lead opinion that an appellant must show the sentence is not only inappropriate in light of the nature of the offense but also inappropriate in light of the nature of the offender, determining Rule 7(B) requires only appellate *consideration* of both the nature of the offense and the character of the offender). If there must be positive evidence as to the character of the offender, our rule would not allow revision here.

[22]     Yet in revising Lane's sentence based on the nature of the offenses, the majority does not refer to the standard requiring "compelling evidence," nor does the majority address any of the examples provided by our Supreme Court. Further, the majority does not discuss or mention (1) A.N.'s victim statement, (2) the State's arguments that the evidence shows Lane was reinitiating the cycle of domestic violence, or (3) the trial court's statements acknowledging the State's arguments and giving those arguments some weight in selecting the sentence.

[23]     As I read Appellate Rule 7(B) and guidance from our Supreme Court, this Court must confront evidence weighing against revision when disturbing a sentence (*i.e.*, evidence supporting the trial court's decision). In any case, here, the majority has not identified evidence so compelling as to overcome the deference we give the trial court under Rule 7(B). *See Stephenson*, 29 N.E.3d at 122 (explaining deference "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense[.]"). For example, in evaluating the nature of the offenses, the majority at times focuses on A.N.'s non-criminal conduct instead of Lane's criminal conduct:

> A.N. did not object to Lane's violations of the no-contact order when she responded to the letters at least six times, encouraging and engaging Lane in a back-and-forth dialogue. Moreover, it does not appear from the record that A.N. ever asked Lane to stop the correspondence. A.N. did not report any of Lane's violations of the no-contact order until January of 2022, four months after receiving the last letter, when Lane was nearing his release date from the DOC.

*Supra* at 5–6.

Yet "[p]rotection orders are about the behavior of the respondent and nothing else." *Patterson v. State*, 979 N.E.2d 1066, 1069 (Ind. Ct. App. 2012) (quoting *State v. Lucas*, 795 N.E.2d 642, 647 (Ohio 2003)). Indeed, "our General Assembly has made it abundantly clear that it recognized the possibility that orders intended to protect persons from domestic violence are issued in settings in which the protected person might invite the subject of the order to enter the forbidden zone and thus violate the order." *Id.* Thus, even if "a protected person invites the subject of a protective order to violate the terms of the order, such is irrelevant to the subject's guilt." *Id.* Moreover, although our legislature has had the opportunity to reduce or eliminate penal consequences when a protected person has responded to prohibited communications (or even invited them), our legislature has elected not to do so. *See Layman v. State*, 42 N.E.3d 972, 978 (Ind. 2015) (discussing the doctrine of legislative acquiescence).

Rather, Indiana law prefers to focus on the defendant's conduct—and this policy preference makes sense. That is, focusing on the victim's conduct (especially a victim subjected to cycles of emotional and physical abuse spanning eighteen years) would vitiate the protective effect of a no-contact order in these emotionally fraught scenarios. Further, focusing on a victim's response overlooks "manipulation tactics" at work in correspondence where—as here—there is evidence the defendant was trying to reengage the victim.

In short, that A.N. initially responded to Lane shows only that Lane's communication strategy was initially effective; he repeatedly bypassed the no-contact order as he tried to gradually regain control over A.N. with his tried-

and-true "manipulation tactics." *Tr. Vol. 2* at 41. The strategy worked, with A.N. responding until she recognized the patterns of her longtime abuser. Thus, to the extent the majority suggests Lane is less culpable because A.N. initially responded to Lane's strategic communications, I cannot say A.N.'s actions render Lane's sentence any less appropriate. Ultimately, it is not A.N.'s fault Lane chose to violate the no-contact order and begin writing to her. And although the majority suggests A.N. should have told Lane to stop violating the law in this way, I cannot say it is a victim's responsibility to stop an abuser.

## Deference to the Trial Court

[27] More basically, Appellate Rule 7(B) allows us to revise a sentence only after "due consideration of the trial court's decision[.]" Time and again the Indiana Supreme Court has reminded us that "[w]e begin [a 7(B)] analysis with 'substantial deference to the trial court's sentence,'" and only then do we "'independently examine' the defendant's offenses and character." *Taylor*, 86 N.E.3d at 165 (quoting *Satterfield v. State*, 33 N.E.3d 344, 355 (Ind. 2015)). We begin with deference to the trial court "[b]ecause sentencing is a highly case-sensitive endeavor" that "we recognize . . . is generally a decision best made at the trial court level." *Gibson v. State*, 43 N.E.3d 231, 241 (Ind. 2015). And that is why Appellate "Rule 7(B) 'places central focus on the role of the trial judge,'" *Brown v. State*, 10 N.E.3d 1, 4 (Ind. 2014) (quoting *Serino v. State,* 798 N.E.2d 852, 856 (Ind. 2003)); because the trial court is the only court with the opportunity to hear the evidence—including a victim impact statement—in person, face to face, *see id.*; *cf. Steele-Giri v. Steele*, 51 N.E.3d 119, 124 (Ind. 2016)

(generally observing "[a]ppellate courts 'are in a poor position to look at a cold transcript of the record, and conclude that the trial judge, who saw the witnesses, observed their demeanor, and scrutinized their testimony as it came from the witness stand, did not properly understand the significance of the evidence'" (quoting *Kirk v. Kirk*, 770 N.E.2d 304, 307 (Ind. 2002))).

[28] Here, the majority revises Lane's sentence without mentioning the trial court's detailed sentencing statement. As to that sentencing statement, the trial court discussed the nature of the offenses and acknowledged the State's assertion that Lane was trying to reinitiate the cycle of domestic violence. Although the trial court said it would not be giving a "tremendous amount of weight" to the State's arguments about the cycle of domestic violence, the trial court nevertheless identified strategies an abuser deploys to regain control over a victim: "Sometimes it looks like it's very 'nice talking' to try to lure the victim back in to try to reestablish the relationship only for it to all go south again when those behaviors reemerge, so I understand the State's statements in that regard." *Tr. Vol. 2* at 56. The trial court also reflected on A.N.'s victim statement, acknowledging that although aspects of Lane's letters might not seem overtly threatening from the perspective of a third party, "looking at [the content] through the eyes of A.N.," the court "could see how she might consider some of that [content] to be concerning at least because she knew, as the victim[,] that [Lane] was not to be having contact[.]" *Id.* at 53.

[29] The trial court further reflected on Lane's decision to repeatedly violate the no-contact order, pointing out that Lane's criminal conduct "constitute[ed]

invasion of privacy times 10." *Id.* at 56 ("No question he violated the law 10 times."). The court placed these repetitive criminal transgressions in context, noting Lane already had extensive contact with the criminal justice system and "knew he was not supposed to have contact . . . with this victim." *Id.* at 55.

[30] At bottom, to comply with the spirit and purpose of Appellate Rule 7(B)—and the rule's directive to give "due consideration [to] the trial court's decision"—appellate courts must fully examine the reasons the trial court selected the sentence. Engaging in this sort of detailed analysis is not only required under Appellate Rule 7(B), but also an important aspect of our appellate function. Indeed, when we identify the "rare and exceptional" case, *Livingston*, 113 N.E.3d at 612—and step into the trial court's lane by disturbing the sentence it chose after thoughtful deliberation—we ought to give guidance to help the court learn from the experience, so it can identify the exceptional case the next time.

## Fully Concurrent Sentences

[31] Next, I take exception to the majority's decision to impose fully concurrent sentences, thereby determining Lane should serve less than one year in prison. The imposition of concurrent sentences in this case conflicts with guidance from the Indiana Supreme Court. That is, in *Cardwell v. State*—which the majority cites—our Supreme Court first explained that our review under Rule 7(B) generally "should focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count." 895 N.E.2d 1219, 1225 (Ind. 2008). Our

Supreme Court next identified an exception to the general rule, noting that "[t]he circumstances do, however, bear on whether consecutive sentences are appropriate." *Id.* The Court gave examples of circumstances warranting consecutive sentences, including the example of "[a]dditional criminal activity directed to the same victim[.]" *Id.* The Court explained that the repeated victimization of one person "should not be free of consequences." *Id.*

[32] By ordering concurrent sentences here, the majority eliminates the practical consequences of Lane's repeated violations of the no-contact order, contrary to the guidance in *Cardwell*. In short, the majority imposes no consequences for the trajectory of Lane's letter-writing or the repeated emotional cost to A.N. This approach is not only in tension with *Cardwell*—this approach is in tension with the Indiana Constitution, which guarantees every victim of a crime "the right to be treated with fairness, dignity, and respect throughout the criminal justice process[.]" Ind. Const. art. 1, § 13. Indeed, whereas the trial court's sentence accounts for A.N.'s victim statement, Lane's repeated criminal conduct directed toward A.N., and Lane's especially poor character—with a track record of manipulation—the revised sentence does none of these things.

[33] As to the impacts of Lane's choice to repeatedly violate A.N.'s privacy, A.N. spoke in detail about why she initially responded to Lane—"I'm a parent, I would want to know about my children so I would respond"—until she realized his motive: "I started feeling expectations, and this is how it's going to be, or this is what I want you to do, and it felt manipulative. . . . [I]t's always good at first, then everything else comes in behind it. So I stopped responding." *Tr.*

*Vol. 2* at 50.  A.N. explained how Lane "terrorizes" her, *id.* at 42, and had taken advantage of her past willingness to give Lane "the opportunity to change," *id.* at 43.  A.N. spoke about how she and the family "have never experienced peace the past couple of years[.]"  *Id.*  She concluded her victim statement as follows:

> I have no more to give.  I have finally decided to choose to believe . . . who he has shown himself to be.
>
> One of the many things I have learned through all of this is that it is the same exact cycle repeated over again and again, and it . . . never stops or changes.  It only can . . . get continuously worse with each release.  In conclusion, I do not feel safe or have any kind of security with the chance of his release.

*Id.* at 44.

[34]     The majority characterizes Lane's letter-writing as "relatively nonthreatening" in nature.  *Supra* at 6.  But A.N.'s victim statement shows otherwise.  In any case, there is ample evidence Lane's ongoing criminal transgressions impacted A.N., causing her to reflect on how Lane had abused her in the past, and to realize Lane was reinitiating that cycle of domestic violence through his letters.  And then Lane kept writing, even after A.N. stopped replying.  He repeatedly invaded A.N.'s privacy in this way, directing criminal conduct toward A.N. over a period of eighteen months.  Yet the majority revises Lane's sentence to an aggregate sentence of just ten months.  This revised sentence is far shorter

than the timeline of the instant criminal conduct toward A.N., underscoring why fully concurrent sentences are inappropriate under the circumstances.[11]

## Criminal Sentencing vs. Probation Revocation

[35] At one point the majority suggests the trial court imposed too severe of a sentence because it "not only [imposed] ten consecutive 300-day sentences" in this cause, "but also . . . revo[ked] [Lane's] probation" in a separate cause. *Id.* at 6; *see also id.* at 7 n.3. But it is a separate procedural matter that Lane violated a condition of his probation by committing these ten new criminal offenses. Furthermore, a defendant's status as a probationer should not benefit the defendant at sentencing in a separate matter; instead, this status weighs *against* sentence revision. *See, e.g.*, *Wright v. State*, 168 N.E.3d 244, 270 (Ind. 2021) ("What's more, [the defendant] was on probation for his earlier crimes at the time he embarked on his crime spree in June 2017, giving us even less of a reason to find his sentence inappropriate."). At any rate, that the trial court revoked Lane's probation in a separate cause is not "compelling evidence

---

[11] At one point, the majority asserts that this dissent focuses on "prior injuries A.N. may have suffered." *Supra* at 6 n.2. On the contrary, this dissent focuses on the nature of Lane's repetitive letter-writing and its collateral impacts on A.N., who has *actually suffered* at the hands of Lane (as his criminal history makes clear). Ultimately, Lane's persistence in violating A.N.'s peace and interrupting her ability to heal from these *past* traumas reflect on the nature of *these* offenses. Moreover, Lane's criminal history also bears on his character. Both are valid considerations under Rule 7(B).

portraying in a positive light the nature of the offense[s] . . . and the defendant's character[.]" *Stephenson*, 29 N.E.3d at 122; *see also Wright*, 168 N.E.3d at 270).[12]

## Comparisons to Dissimilar Cases

[36] In a footnote, the majority compares Lane's sentence to sentences imposed in cases involving different criminal offenses. *See supra* at 7 n.4 (comparing Lane's sentence to sentences in cases involving Level 3 felony rape, Level 6 felony domestic battery, and Level 5 felony domestic battery). To be sure, this Court may (but need not) look to sentences imposed in other cases when deciding whether the instant sentence is inappropriate. *See, e.g.*, *Knight v. State*, 930 N.E.2d 20, 22 (Ind. 2010). However, the Indiana Supreme Court has indicated these types of comparisons are proper only when the other cases involve "the same or similar crimes." *Id.* (quoting *Trowbridge v. State*, 717 N.E.2d 138, 150 (Ind. 1999)). Moreover, this Court has generally found little value in the practice. *See, e.g.*, *Brown v. State*, 760 N.E.2d 243, 247 (Ind. Ct. App. 2002) ("We should concentrate less on comparing the facts of this case to others, whether real or hypothetical, and more on focusing on the nature, extent, and depravity of the offense for which the defendant is being sentenced, and what it

---

[12] In this case, the trial court held a consolidated hearing after Lane (1) admitted to violating the conditions of his probation in one cause, for which the trial court was tasked with selecting a sanction, and (2) pleaded guilty to crimes charged in this separate criminal matter, for which the trial court was tasked with selecting a sentence. That the court resolved separate causes in a consolidated hearing—action that promoted judicial economy and afforded convenience to Lane, counsel, and those charged with transporting Lane to the courtroom—does not make the revocation decision part of "the 'forest'" of circumstances bearing on the appropriateness of the sentence imposed for discrete criminal conduct. *Supra* at 7 (applying Rule 7(B) and referring to the trial court's sentence as "an aggregate executed term of ten and a half years," thereby combining the 8.2 years imposed here with the previously suspended term imposed in a separate cause).

reveals about the defendant's character."), *trans. denied*. Therefore, I cannot join the majority in collecting cases based exclusively on the panel deciding those cases rather than on similarities in the cases themselves. *See supra* at 7 n.4.

## Conclusion

[37] All in all, when it comes to sentence revision under Rule 7(B), deference to the trial judge "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson*, 29 N.E.3d at 122. And although I agree with my colleagues that Lane failed to show his character supports sentence revision, I ultimately disagree that Lane presented "compelling evidence portraying in a positive light the nature of the offense." *Id.* Therefore, I cannot join the majority in revising Lane's sentence. I would instead defer to the trial court and affirm the sentence imposed.

[38] For all these reasons, I respectfully dissent.